**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| DEREK BEACHUM,<br><br>             Plaintiff,<br><br>      v.<br><br>NFI MANAGEMENT SERVICES, LLC,<br><br>             Defendant. | Civil No. 18-9173 (RMB/AMD)<br><br>**OPINION** |

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court on the Motion for Summary Judgment brought by Defendant NFI Management Services, LLC ("NFI"). [Docket No. 38.] For the reasons expressed below, the Court will grant NFI's Motion, in part, and deny, it in part.

**I.    FACTUAL BACKGROUND**

This case stems from Plaintiff Derek Beachum's employment with NFI, during which Beachum alleges NFI discriminated against him and unlawfully fired him.

NFI is a shipping logistics company with approximately 240 locations and 800 employees across the United States and Canada. [See Docket No. 42-1, at 4, ¶ 23.] NFI has a Code of Conduct for its employees, which states in relevant part: "Corrective action may include a verbal warning, written warning, final written

warning, suspension and/or discharge. The appropriate progressive disciplinary action imposed will be determined by NFI and does not guarantee that one form of action will necessarily precede another." [Docket No. 42-48, at 1.][1] NFI's employees include Kevin Strong, Beachum's supervisor; Rodney Lucas, the Director of Application Services and Strong's supervisor; John Manson, the Human Resources Business Partner; and Katina Rowe,[2] a Leave of Absence Administrator in the Human Resources department.

Beachum is a 38-year-old Black man who has suffered from "serious gastrointestinal medical conditions, including Crohn's Disease, colitis and chronic inflammatory bowel disease" since

---

[1] Beachum contends that this is a progressive discipline policy. The only evidence he cites that even remotely supports that is from Lucas' deposition:

> Q.   What type of discipline, to your knowledge, does [Strong] have authority to issue [employees he supervises]?
> A.   Up to and including separation from the company.
> Q.   So I'm assuming verbal warning is one of them?
> A.   Yes.
> Q.   A written warning?
> A.   Yes.
> Q.   How about a suspension, is that an option?
> A.   Suspension, as far as I know, is not an option, but we — after the written warnings, and there are typically several of each of the verbal and written, then we move onto a personal improvement plan.
> Q.   How about a final written warning, is that a disciplinary step?
> A.   It would be — if we do three written warnings, it would be the third, yeah.

[Docket No. 42-11, at 19:12 to 20:7.]

[2] Ms. Rowe's last name is now Williams. However, in the interest of consistency and clarity, the Court will utilize her former last name throughout.

2

approximately 2012. [See Docket No. 42-1, at 5, ¶¶ 32, 35.]
Beachum experiences symptoms — including diarrhea, fatigue,
abdominal pain, weight loss and malnutrition — of these
conditions daily, and as a result needs to use the bathroom
frequently. [Id. at 5, ¶¶ 33-34.] He takes various medications
for these conditions. [Id. at 5, ¶ 36.] He has been hospitalized
as a result of them, including twice during his employment with
NFI. [Id. at 5, ¶¶ 37-40.] Those hospitalizations took place
from May 17 to 20, 2016, and October 26 to 28, 2016. [Id.]
Beachum saw a gastroenterologist named Dr. Jack DeVita
throughout his employment with NFI. [Id. at 5-6, ¶¶ 41-43.]

Beachum worked in NFI's IT department at their Voorhees,
New Jersey, location on two separate occasions: first from
approximately May 2014 to May 2015, and again from approximately
April 2016 to March 2018. [Id. at 1, 4, ¶¶ 2, 24.] The second
period of employment ended in the termination that is the
subject of this suit.

Beachum was initially supervised by Fredric Bolinder from
May 2014 to March 10, 2015, at which time Strong became his
supervisor. [Id. at 2, ¶ 7; Docket No. 47-1, ¶ 7.] During this
first period, Beachum did not disclose to NFI any medical
conditions, nor did he request FMLA leave or any accommodations.
[Docket No. 42-1 at 2, ¶ 8.] He received positive feedback about
his job performance and did not receive any discipline during

3

this time. [Id. at 2, ¶ 9.] He did not have any complaints about his supervisors, either. [Id. at 2, ¶ 11.] This employment ended in May 2015, when Beachum voluntarily left for another job. [Id. at 2, ¶ 12.]

Just under a year later, NFI re-employed Beachum as a Lead Integration Developer, a newly created position. [Id. at 2, ¶ 13.] This second period of employment lasted from April 2016 to March 2018. [Id.] Once again, he was supervised by Strong, who in turn reported to Rodney Lucas, the Director of Application Services. [Id. at 2-3, ¶¶ 14-15.] Strong is white; Lucas describes his race as "Caucasian, [and a] little bit of [N]ative American." [See id. at 3, ¶ 15; Docket No. 42-11, at 33:17-19.] Strong had the authority to hire, discipline, and fire employees, as well as the responsibility to evaluate them. [Docket No. 42-1, at 3, ¶ 17.]

The parties dispute when Beachum told NFI about his medical condition. He claims, citing his own testimony in addition to testimony that does not support the assertion,[3] that he did not notify anybody at NFI about his condition until approximately the summer of 2017, about a year after his second period of

---

[3] Confoundingly, Beachum cites a portion of Strong's deposition in which Strong testified that "it was known before [NFI] even rehired him in 2016 that he had some form of gastrointestinal issues that could potentially cause issues, cause him to work from home from time to time." [Docket No. 42-1, at 6, ¶ 45 (citing Docket No. 42-10, at 90:13-24, 91:2-8).]

employment began. [Id. at 6, ¶ 45.] Conversely, NFI states that Beachum notified Strong and Lucas of his conditions during the interview process prior to his second period of employment. [Docket No. 38-2, ¶ 25.] Moreover, NFI contends that other employees knew about his conditions before May 2017 as well. [Id. at 7 n.2.] As noted, for example, Strong's testimony supports this.

In any event, it appears that he was permitted to work from home in 2016.[4] NFI does allege that towards the end of 2016 Beachum was "handling too much himself," which prompted Lucas to direct Beachum to "delegate more." [Docket No. 47-1, ¶ 29.]

---

[4] The Court comes to this conclusion based on Paragraph 27 of NFI's statement of material facts: "In addition to working from home, Plaintiff exceeded his pro-rated PTO allotment of 10.5 days (or 84 hours) in 2016." [Docket No. 38-2, ¶ 27 (emphasis added).] Beachum admitted this paragraph in his response to the statement of material facts. [Docket No. 42-1, at 21, ¶ 27.]

This creates an apparent contradiction in Beachum's version of events: He was evidently allowed to work from home before May 2017. [See id.] However, he claims that he was only permitted to work from home and show up late after he disclosed his medical conditions to Strong. [Id. at 9, ¶ 70.] But he claims that he did not tell Strong about his conditions until May 2017. [Id. at 6, ¶ 45.] Paragraph 70 of Beachum's statement of material facts encapsulates this potential contradiction:

> After Mr. Beachum disclosed his medical conditions to Mr. Strong and requested/used medical accommodations, including working at home, Mr. Strong's and Mr. Lucas' treatment of Mr. Beachum changed for the worse. For example, Mr. Strong, despite previously telling Mr. Beachum he was permitted to work from home and be late (on occasion), told Mr. Beachum that he was not present enough in the office and that he was taking too much time off.

[Id. at 9, ¶ 70 (emphasis added) (citations omitted).] This creates a Schrödinger's cat-esque dilemma: Strong was simultaneously aware of Beachum's medical conditions (because he allowed him to work from home and come in late to accommodate those conditions) and unaware of them (because Strong's treatment of Beachum, particularly with respect to him working from home, changed once Strong learned of those conditions).

However, on the whole, NFI was satisfied with Beachum. [Id., ¶ 26.] In March 2017, Strong issued Beachum a satisfactory performance evaluation, with an overall rating of 3.00 ("Achieving") on a four-point scale (with four being "Exceeding"). [Docket No. 42-29, at 1-2.]

But beginning in April 2017, Strong claims, Beachum "started missing deadlines" and "asking for assistance with things that [Strong] felt someone who [NFI] hired as a lead and who had previously been a senior with the company should know the answer to and be able to research on his own." [Docket No. 47-5, at 82:23 to 83:4.] Still, these transgressions were apparently minor enough that Strong did not notify Mansor, the Human Resources Business Partner, who testified that he was not made aware of any issues with Beachum prior to October 2017. [Docket No. 42-9, at 56:14-21.]

It is undisputed, however, that Beachum exceeded his allotted PTO in 2016: he took 104 hours (13 days) of PTO, despite being allotted only 84 hours (10.5 days). [Docket No. 38-2, ¶ 27.] Moreover, by May 5, 2017, Beachum had exhausted his PTO allotment for 2018 of 144 hours (18 days). [Id. ¶ 28.]

By May 2017, it is undisputed that NFI knew about Beachum's health conditions, and Strong suggested that Beachum apply for FMLA leave. [Docket No. 38-2, ¶ 31.] On May 15, 2017, Beachum requested the necessary FMLA paperwork, which NFI provided. [Id.

6

¶ 33.] That same day, however, he cancelled his request. [Id. ¶ 34.]  Beachum also requested and received the paperwork on June 23, 2017, but never completed it. [Id. ¶¶ 35-37.]

For the next several months, it is undisputed that Beachum was not disciplined in any way. [Id. ¶ 38.] Beachum, however, alleges that during this time he suffered from discrimination and harassment. [Docket No. 42-1, at 9, ¶¶ 70-80.] NFI disputes each of these allegations. [See Docket No. 47-1, ¶¶ 70-80; Docket No. 38-2, ¶¶ 88-92.]

First, Beachum claims that Strong criticized him for working from home and not being present in the office enough. [Docket No. 42-1, at 9, ¶ 71.] NFI notes that it was not until October 2017, at least five months after Beachum disclosed his medical conditions, that NFI confronted him about the excessive time he spent out of the office. [Docket No. 38-2, ¶ 45.]

Second, Beachum claims that in mid-2017, Strong criticized Beachum's "food choices in the presence of other employees, including telling him that the food he chooses to eat affects his medical conditions." [Docket No. 42-1, at 9, ¶¶ 72-73.] NFI points out that the only evidence Beachum cites for this assertion is a portion of Beachum's deposition in which he states that Strong would publicly ask Beachum "[i]f the items that [Beachum was] consuming are not in fact affecting [his] condition." [Docket No. 42-2, at 231:5-18.]

Third, Beachum says that Strong and Lucas asked him "a couple times per month" "if he really needed to 'use the bathroom' so frequently," asked him why he used the bathroom so often, and commented on how frequently he used the bathroom. [Docket No. 42-1, at 9, ¶¶ 74-75.] Strong and Lucas deny that they ever made these comments. [Docket No. 47-1, ¶¶ 74-75.] NFI also points out that the evidence Beachum cites in support of this assertion is a portion from Beachum's deposition in which he asserts that Lucas made such comments "at least twice" and Strong made comments "at least once" in nearly two years of employment. [Id. ¶ 74.]

Fourth, Beachum alleges that, once every couple of months for approximately eight months, his coworker Matthew O'Brien and others "made derogatory comments," of which Strong was aware, "about . . . Beachum's medical conditions and need for accommodations, including making negative comments about what [he] ate and how often he needed to use the bathroom." [Docket No. 42-1, at 9, ¶ 76.] Strong even witnessed some of the comments but never did anything to address them, according to Beachum. [Id. at 9, ¶ 77.] Beachum claims to have notified Strong and Lucas that he was hurt by these comments and asked them to stop making them, but they continued to make them. [Id. at 9, ¶¶ 79-80.] NFI alleges that Strong only heard two people (coworkers Bradley Applegate and O'Brien) comment on how often

8

Beachum used the bathroom. [Docket No. 47-1, ¶ 76.] NFI also points out that O'Brien had a gastrointestinal issue, too, and Beachum admitted that he and O'Brien would "compar[e] notes" on their conditions every few months. [Docket No. 38-2, ¶¶ 90-91.] NFI also points to the following excerpt from Beachum's deposition, with respect to derogatory comments by Strong:

> Q.  . . . Did Mr. Strong ever say anything that you
> recall regarding your Crohn's disease?
> A.  Yes.
> Q.  What did he say?
> A.  Pertaining to it, that I was not present.
> Q.  Anything else?
> A.  To my knowledge, that's — that's all I can
> remember.

Finally, Beachum alleges that NFI moved his cubicle farther away from the restroom in late 2017. [Docket No. 42-1, at 9, ¶ 78.] NFI counters that, as Beachum himself testified, "everyone except Kevin Strong" — in other words, Beachum's entire team — had their cubicle moved at that time. [Docket No. 42-2, at 231:22 to 233:21.]

Also during this time — between approximately April and October 2017 — NFI says it started noticing that Beachum was missing deadlines and tried to counsel him. [Docket No. 38-2, ¶ 39.] Beachum denies this, without citation to any evidence. [Docket No. 42-1, at 24, ¶ 39.] Instead, Beachum simply argues that it does not make sense that NFI noticed issues with

Beachum's performance but did not do anything about it for six months. [Id.]

Next, Beachum claims that in September or October 2017, Strong and Lucas told him that "his job was to assist his team members with completing their assignments but not to actually perform the work himself." [Docket No. 42-1, at 4, ¶ 29; see also Docket No. 42-2, at 155:18-21.] But Beachum also testified that during that exact same time period — "in the month of September or October" — Strong told him that he was, in fact, supposed to "actually do the work, not to hand the work off." [Docket No. 42-2, at 157:9-21.]

In October 2017, Strong notified Beachum that his team members viewed Beachum as being "in and out" of his group. [Docket No. 38-2, ¶ 44.] In an October 6, 2017, meeting, Strong told Beachum:

> While we have always been lenient about allowing employees to work from home or come in late as necessary, that has always come with the qualification that excessive use of this leniency is to be avoided. Recently the trend has been a couple days a week I am informed that you need to either work from home or that you will be in the office late. The expectation is that you will be in the office from 9-6 each day. If you are going to be later than 9, the expectation is that you will stay later in the office to make up that time. I do not have confidence that this is currently happening.
> When the need to work from home arises, the expectation is that you are working and actively replying to emails, [G]oogle [C]hat and other communication. It is expected that you will attend the regular meetings that are scheduled. When you are

10

working from home, I commonly get questions about
whether you are working that day due to a lack of
responding to these communications. They all feed into
the principle of Being Present.

Your position is one of leadership. Your team
should be looking to you as an example to be emulated.
Currently, the example being put forth is one where
you are frequently not in the office. When you are in
the office, it is not uncommon to find you in the
break room for an hour or more at a time. We all need
breaks from time to time, but we need to be mindful of
how long those breaks are and to be ensuring that they
are not impeding our job functions.

[Id. ¶ 45.] Beachum does not dispute anything alleged in that

statement but claims that he was merely utilizing the

accommodations that he had been granted. [Docket No. 42-1, at

26, ¶ 45.] NFI further alleges that it discussed several

performance issues with Beachum in that meeting, including that

he was late or worked from home "as often as on time in office,"

his team did not view him as a leader, his coworkers had a

perception "that even when in the office he isn't doing

anything," and that he is "frequently seen in the breakroom

instead of at [his] desk." [Docket No. 38-2, ¶ 48.] Beachum

disputes those assertions insofar as he claims that he had not

"been violating any policies [or] procedures," but rather "had

been working at home on some days because of his medical

conditions, as he was granted permission to do so." [Docket No.

42-1, at 26, ¶ 48.]

NFI also contends that Beachum's work product was

unsatisfactory. NFI points to three examples of this: the Log

11

Trim Script project, the Pelican Warehouse Split project, and the Managed File Transfer project. According to NFI, Beachum began working on the Log Trim Script project on October 4, 2017, and told Strong on October 10 that he would complete the project that day. [Docket No. 38-2, ¶ 49.] A week later, according to NFI, Beachum had not yet completed the project because, he told Strong, he "unilaterally moved it down in priority due to complication." [Id.] On November 2, Strong asked for an update and Beachum did not respond. [Id.] On November 27, Strong told plaintiff that the project needed to be finished by December 1. [Id.] On December 4, Strong reached out again, and Beachum said that he would finish the project by December 5. [Id.] On December 11, Beachum indicated that the project was nearly complete, but needed to be refined. [Id.] Beachum contests this sequence of events. He claims that the completion of the project was delayed not due to his lack of diligence, but because Strong "repeatedly requested that Mr. Beachum continue to make changes to the functionality of the log trimmer." [Docket No. 42-1, at 26, ¶ 49.]

The next project that caused problems was the Pelican Warehouse Split project. The parties do not dispute the facts about this project. On October 11, 2017, Beachum told Strong that he would complete the project by October 16. [Docket No. 38-2, ¶ 50.] On October 17, the project still incomplete, Strong

12

told Beachum to finish it. [Id.] On November 2, Strong requested an update, to which Beachum did not respond. [Id.] On November 28, Strong advised Beachum that his failure to complete the project causing delays in testing. [Id.] On December 4, Strong requested another update. [Id.] On December 5, Strong directed Beachum to finish the project by the end of the day. [Id.] On December 5 and 6, Beachum requested assistance. [Id.] On December 7, Beachum "ask[ed] that prior software updates be rolled back as [his] solution [was] not working." [Id.] Late that afternoon, Strong took over responsibility for the project and was able to achieve 95% completion. [Id.] O'Brien proceeded to finish the project that afternoon. [Id.]

Finally, NFI alleges the following with respect to the Managed File Transfer project: On October 17, 2017, Strong instructed Beachum to complete the project by the end of October. [Id. ¶ 51.] On October 24, he reminded Beachum "that transfers need to be included on rollout sheet by October 25." [Id.] On October 30, Strong noticed that Beachum had made an error on the project and told him to fix the mistakes by the end of the week. [Id.] On November 2, Strong requested an update, to which Beachum did not respond. [Id.] By November 20, Beachum still had not made any changes, so Strong followed up. [Id.] On December 4, Strong directed Beachum to update the spreadsheet; the next day he told Beachum that this had to be completed by

13

the end of the day. [Id.] On December 11, Strong asked Beachum about the project, told him that the spreadsheet was still inaccurate, and directed him to finish the project by the following week. [Id.] Beachum claims that "Strong's assertion that Mr. Beachum failed to complete items as of the end of October 2017 is untrue." [Docket No. 42-1, at 27, ¶ 51.] In support of that assertion, he cites the following portion of his own deposition:

> Q.   What is untrue about [a statement reading, "As of the end of [2017], there are still items lingering that were to be completed by the end of October."]?
> A.   From my recollection, there were not items left that were to be completed by the end of October.

[Docket No. 42-2, at 128:3-7.] He continued:

> Q.   Was the MFT completed by the end of the year?
> A.   I cannot remember.
> Q.   Was it completed by October?
> A.   I honestly cannot remember.
> Q.   So how do you know that there were no items lingering that were to be completed by the end of October?
> A.   I do not remember the specific items. I do not remember each individual item.

[Id. at 128:8-17.]

On November 14, 2017, Beachum again reached out to NFI — specifically to Rowe, the Leave of Absence Administrator — to inquire about applying for FMLA leave. [Docket No. 42-41.] On the morning of November 17, 2017, Lucas reached out to Mansor, the Human Resources Business Partner, seeking "help on the next steps for disciplinary action" against Beachum, whom he

14

described as "an under-performer." [Docket No. 38-36 (showing email was sent at 9:24 a.m.); see also Docket No. 38-2, ¶ 47.] Later that same day, Rowe notified Mansor that Beachum had contacted her about FMLA leave. [Docket No. 38-2, ¶ 56.] Rowe wrote: "This is his 3rd request within a year, but he never returns the certification so that I can make a determination. It seems as if he is documenting his communications with My-NFI regarding FMLA. Something is very strange regarding his inquiries and his requests." [Id.]

On December 12, 2017, Strong sent Mansor an email that included a timeline memorializing Beachum's performance issues. [Id. ¶ 48.] That timeline included the three projects discussed above. [Id. ¶¶ 49-51.] Then, on December 20 at 7:27 a.m., Strong notified Mansor that he had had another meeting with Beachum, who had "f[allen] short on another item that was assigned." [Id. ¶ 54.] Beachum denies that he failed to satisfactorily complete the project. [Docket No. 42-1, at 27, ¶ 53.]

Meanwhile, although Beachum received the FMLA paperwork in November, by mid-December he still had not completed it. On December 20 — the same day that Strong sent Mansor the email mentioned above — Rowe reached out to Beachum via email and telephone to remind him that his FMLA request would be closed unless he submitted the required paperwork by December 27. [Docket No. 38-2, ¶ 57.] Later that day, Beachum submitted a

15

completed FMLA application, which included a Certification from his healthcare provider, Dr. DeVita. [Id. ¶ 58.] On December 28, NFI granted Beachum's intermittent FMLA application, permitting him to take up to six absences per year, with an expected duration of approximately five days each, in the event that his conditions flared up. [Id. ¶ 61.] Rowe told Strong and Mansor of the approval that same day. [Id. ¶ 62.]

Two days later, Strong prepared a draft Performance Improvement Plan ("PIP") for Beachum. [Id. ¶ 55.] On January 4, 2018, he revised the PIP to reflect Beachum's FMLA eligibility: Beachum would not be penalized for missing deadlines due to intermittent FMLA leave. [Id. ¶¶ 63-64.] Rather, if he were to miss a deadline because of intermittent leave, he was merely required to "keep Kevin Strong fully updated on [his] progress so that coverage can be arranged." [Id. ¶ 64.] Beachum signed the PIP on January 8. [Id. ¶ 65.] Beachum alleges that he was not issued any verbal or written warnings for any reason prior to being put on the PIP. [Docket No. 42-1, at 10, ¶ 81.] NFI disputes this, given the meeting that Strong undisputedly had with Beachum in October 2017, the verbal warnings Strong allegedly gave Beachum prior to November 17, 2017, and other forms of counseling NFI claims to have engaged in. [See Docket No. 38-2, ¶¶ 39-55.]

16

The PIP included a recitation of Beachum's alleged underperformance and NFI's remedial efforts, discussed above. [Id. ¶ 66.] However, as noted above, Beachum claims that he did not miss any deadlines, based on his own somewhat contradictory testimony noted above. [See Docket No. 42-1, at 29, ¶ 66.] The PIP further stated:

> You are being placed on a written improvement plan. For the next 60 days, your work will be closely monitored by your leadership team. You must demonstrate immediate improvement in the following areas:
>
> **Presence**: As a leader, it is expected that you will be in the office during your appointed office hours, 9:00 – 6:00. Every effort should be made to avoid working from home or arriving late. Any delay in arriving in the office should be reported immediately via text or phone call. In the event that working from home is necessary, Kevin Strong should be notified immediately. It also needs to be communicated to your team that, although you are not in the office, you are still working and available. While working from home, it is expected that your normal work output continue and that you be available to attend meetings or assist your team as if you were present in the office.
>
> **Performance**: Tasks will be assigned with completion dates. It is expected that tasks will be fully completed prior to the completion date. It is also expected that you will proactively provide status updates to your supervisor regarding the health of these assignments. If you will miss a deadline because of your intermittent leave, you must keep Kevin Strong fully updated on your progress so coverage can be arranged. As a lead, you should be familiar with all NFI's integration systems and processes and be able to provide assistance to your team for all tasks they require. Should you be unable to render assistance, direct them to Kevin Strong for his input. Once the roadblock has been overcome, you should follow up to

17

> find out how the solution was implemented so you have
> that knowledge for the future.

[Docket No. 38-2, ¶ 68.] Beachum does not contest the contents
of the PIP, but argues that any "presence" issues are "patently
discriminatory and retaliatory" since he was merely taking
advantage of the accommodations NFI had given him for his
medical conditions. [Docket No. 42-1, at 29-30, ¶ 68.] He also
alleges that, in the PIP meeting, he asked how his improvement
would be measured but did not receive a response. [Id. at 11, ¶
90.] NFI disputes that assertion, noting that "the PIP speaks
for itself and states how [Beachum's] performance would be
measured." [Docket No. 47-1, ¶ 90.]

The day after he signed the PIP, Beachum emailed Mansor to
express his concern that the PIP was issued in retaliation to
his FMLA application and approval. [Docket No. 42-1, at 13,
¶ 106.] Mansor and Beachum had a conversation in which Mansor
claims to have reiterated the non-FMLA-related issues that
prompted the PIP. [Docket No. 47-1, ¶ 106.] Beachum alleges that
Mansor simply told him that his concerns were "unwarranted and
unrelated." [Docket No. 42-1, at 13, ¶ 107.]

In the nine weeks after Beachum signed the PIP, he either
showed up late, left early, or worked from home on sixteen
different occasions. [Docket No. 38-2, ¶ 69.] Beachum claims
that four of those incidents are excusable: On February 23,

2018, and March 8, 2018, he indicated that he would be taking
PTO. [Docket No. 42-1, at 30, ¶ 70; see also Docket No. 38-2, ¶
69.] He also notified Strong that his January 18, 2018, absence
"could be" FMLA-approved, and his January 29 absence "can also
be used as FMLA." [Docket No. 42-37 (January 18); Docket No. 42-
47 (January 29).]

Strong did not designate or code those days as FMLA leave.
[Docket No. 42-1, at 8, ¶ 61.] Beachum alleges that this was
Strong's responsibility. [Id. at 3, ¶ 18.] NFI argues that,
while Strong is responsible for coding employees' time off as
either PTO or LOA, it is Human Resources that takes the next
step of designating any LOA-coded time as FMLA-approved. [Docket
No. 47-1, ¶ 18.] Beachum seems to concede this point as he
states in his counterstatement of material facts that
"Rowe . . . is responsible for . . . tracking employees' use of
FMLA." [Docket No. 42-1, at 4, ¶ 31.] In any event, NFI presents
no argument that Strong designated the time as LOA, either.

NFI argues that the failure to code the two days in
question as LOA or FMLA-approved is irrelevant. It posits three
arguments. First, it argues that Beachum's FMLA approval does
not even apply to the days in question, since he "was approved
to use FMLA for absences lasting 4-5 consecutive days," and
these absences were for a half-day and day, respectively. [See
Docket No. 47-1, ¶ 61.] Second, NFI argues that Beachum never

19

provided any medical documentation with respect to these days off. [Id.] Finally, NFI alleges that Strong was only ever aware that one of the days in question (January 18) could have been FMLA-approved. [Id.] (This, however, is contradicted by NFI's own statement of material facts, which asserts that Beachum advised Strong on January 29 that "[t]his day can also be used as FMLA." [Docket No. 38-2, ¶ 69.])

Regardless of the above allegations, Beachum does not put forward any justification for the other twelve times that he showed up late, left early, or worked from home while on his PIP. [See Docket No. 38-2, ¶ 70 (noting sixteen such absences); Docket No. 42-1, at 30, ¶ 70 (giving justification for only four of the absences).]

In addition to the absences, NFI continued to take issue with Beachum's performance. On January 23, Strong notified Mansor that Beachum was "starting to have some instances where he is still slipping (not hitting specified dates, not providing status updates)." [Docket No. 38-2, ¶¶ 72.] On January 29, Strong and Beachum had a one-on-one meeting at which they discussed Beachum's failure to timely complete a project. [Id. ¶ 73.] On February 19, Strong recorded a note that Beachum was "still missing deadlines" and "frequently" late. [Id. ¶ 74.] Nevertheless, NFI decided to extend Beachum's PIP near the end of February because he had shown some improvement, including by

20

completing one project by its deadline. [See, e.g., Docket No. 42-27; Docket No. 47-1, ¶ 94.]

However, at the end of February, NFI claims that Strong learned from Beachum's coworkers that Beachum owned and ran a separate IT consulting business and that he was "frequently in a back room [at NFI] with his laptop taking phone calls" pertaining to that business. [Docket No. 38-2, ¶ 76 (disputed).] Strong notified Mansor of this, and soon thereafter Mansor investigated. [Id. ¶ 77.] The investigation revealed that Beachum had incorporated his own IT consulting business, called Prime Solutions Services LLC ("Prime Solutions"), in 2015. [Id. ¶ 78.] Beachum claimed that the business was dormant, but, as NFI points out, four of his NFI coworkers independently testified that Beachum "told them that his side IT consulting business generated more work than he could handle, and attempted to recruit each of them to work for him." [Id. ¶ 79.] Mansor's investigation also revealed that Beachum's wife, Kelli, listed Prime Solutions as her employer from April 2016 to October 2017. [Id. ¶ 80.] Notably, Beachum points to no evidence to dispute any of the above allegations about the investigation into Prime Services. [See Docket No. 42-1, at 32-33, ¶¶ 78-80.] Instead, he makes the following blanket statement:

> It is admitted that Mr. Beachum created his own IT
> consulting business in 2015 but denied that this has
> anything to do with his employment with or termination

21

from employment with Defendant. To be clear, Mr.
Beachum has produced many documents reflecting the
business of Prime Solutions, as required by this
Court. In addition, Defendant has admitted that Mr.
Beachum was permitted to work for another company
during his employment with Defendant, that Mr. Beachum
did not engage in any wrongdoing and that Mr. Strong's
allegation was unsubstantiated and without evidence.
In addition, Defendant admits that Mr. Beachum's
personal business and Mr. Strong's bald allegations
about it had nothing to do with Mr. Beachum's
termination. Defendant's continuous reliance on the
existence of a separate business that [sic] is
perplexing to say the least but also reflects its
desperation in trying to muddy Mr. Beachum's
character.

[Id.][5] In any event, NFI did not rely on this allegation when it

decided to terminate Beachum's employment. [Docket No. 42-9, at

141:7-14.]

---

[5] In support of that entire paragraph, Beachum cites only the following
testimony from Mansor:

    Q.    Are you aware of any company policy that would prohibit Mr.
Beachum from doing work for his own company on his lunch hour?
    A.    I would have to review the policies but generally speaking,
as long as, you know, there's no conflict of interest or it
doesn't interfere with the work that's to be done, I personally
didn't see any issue with it.

    . . . .

    Q.    And even [the evidence you found], all that wasn't enough
for you to substantiate, right?
    A.    Substantiate what?
    Q.    That he was doing his own company work on NFI time.
    A.    Well, I never witnessed or observed him doing any personal
business on NFI time.
    Q.    Right. So you never came to the conclusion that he had done
his own business on NFI time, right?
    A.    I would say that's accurate.
    Q.    And at any point prior to his termination was he issued any
discipline for performing any work for his own company while on
NFI time?
    A.    No, not to my knowledge.

    . . . .

Around the same time of this investigation, on March 7, Beachum complained to Mansor about race discrimination. [See Docket No. 38-2, ¶ 83; Docket No. 42-1, at 33-34, ¶ 83.] Beachum complained that he had received unfair treatment and was being targeted based on "the color of [his] skin." [See Docket No. 38-2, ¶ 83; Docket No. 42-1, at 33-34, ¶ 83.] Beachum points to three examples that led him to believe he was the victim of racial discrimination. First, during his first period of employment with NFI, Beachum was not "presented with the option to moving up to an elevated role of supervisor." [Docket No. 42-2, at 133:16-20.] Instead, NFI promoted Strong (who is white and had been at NFI for nine years) rather than Beachum (who is Black and had been at NFI for one year). [Docket No. 38-2, ¶ 85.] He alleges that this was part of a broader practice at NFI to turn down Black employees for promotions. [Docket NO. 42-1, at 14, ¶ 114.] Second, he was "verbally told about being in the break room for a period of time when there were other [non-Black] parties from within the team that were in the break from also at a different time." [Docket No. 42-2, at 133:23 to 134:3; Docket No. 42-1, at 13, ¶ 112.] Third, Beachum claims that NFI's

---

Q.   Okay. And during the termination meeting did Mr. Strong tell Mr. Beachum that one of the reasons he was being fired was because he was doing work for his own company on NFI time?
A.   No.
Q.   To your knowledge was that one of the reasons he was fired?
A.   No.

[See Docket No. 42-9, at 106:16-23, 111:7-22, 141:7-14.]

issue with how often he was out of the office was an example of racial discrimination. [Docket No. 42-1, at 14, ¶ 113.] He claims that three non-Black coworkers on the IT team (O'Brien, Bridget Costandino, and Applegate) worked from home "several times per month and were never disciplined." [Id.]

NFI disputes each of the allegations of racial discrimination. First and foremost, it notes that the reason for any disparate treatment between Beachum and any of his coworkers is simply because he had performance issues and his coworkers did not. [See Docket No. 47-1, ¶¶ 112-13.] NFI disputes Beachum's allegation that NFI did not promote Black employees and points out that the evidence he cites to support this allegation is little more than speculation or office rumors. [Id. ¶ 114.] As to the alleged discriminatory treatment about working from home, NFI disputes the characterization that the three employees Beachum claims worked from home "several times per month": O'Brien works from home approximately once or twice per year and Costandino does approximately seven times per year. [Id. ¶ 113.][6] NFI also reiterates that neither O'Brien nor Costandino had performance issues, nor were they team leaders like Beachum. [Id.]

---

[6] NFI does not mention how often Applegate works from home. Instead, they refer to David Sambath, who works from home weekly. [Docket No. 47-1, ¶ 113.]

Beachum alleges that NFI never investigated his complaint of racial discrimination. [Docket No. 42-1, at 14, ¶¶ 116-17.] NFI disputes this, noting that Mansor interviewed Beachum, Costandino, O'Brien, and Strong about the complaint. [Docket No. 47-1, ¶ 116.]

Meanwhile, also on March 7, Strong notified Mansor of another instance of Beachum failing to meet expectations on a project for a "high priority customer." [Docket No. 38-2, ¶ 86.] According to Strong, Beachum missed the first deadline on the project; failed to proactively update Strong on his progress; failed, for several days after the deadline had already passed, to troubleshoot an issue that Strong was able to resolve in thirty minutes and estimates should not have taken Beachum more than two hours; failed to adequately monitor the first and second "rollouts" of the project; and failed to take responsibility for troubleshooting after the rollout and instead relying on Strong under the guise that Beachum "wanted as many eyes on the issue as possible" since it was an important customer. [Id. ¶ 86.] Strong also lamented that on February 26, he called Beachum, who was assigned to do off-hours support, about an issue at 9:00 p.m., only for Beachum to not resolve the issue — described by Strong as "an error that should have taken 15 minutes to address" — until two hours later. [Id.] Strong concluded, "These two [troubleshooting] items together make me

25

think he has problems being able to troubleshoot issues, which
is a very important function for anyone on the integration team.
I would expect a lead developer to be able to troubleshoot
anything on their own." [Id.] Beachum admits solely that
Strong's correspondence with Mansor made the above allegations.
[Docket No. 42-1, at 31, ¶ 86.] However, he presents no evidence
to contradict these allegations. [See id.]

   Ultimately, on March 13, 2018, NFI terminated Beachum's
employment. [Docket No. 38-2, ¶ 87.] Strong made the decision in
consultation with Lucas and Mansor. [Docket No. 42-1, at 14,
¶ 119; Docket No. 47-1, ¶ 119.] Strong and Mansor held a meeting
with Beachum in which they informed him of the decision. [Docket
No. 42-1, at 14, ¶ 120.] The stated reason for terminating
Beachum's employment was performance issues, including his
failure to meet deadlines, the unsatisfactory quality of his
work, and his lack of a consistent presence at work. [See id. at
14, ¶ 121.] NFI offered Beachum a severance package, which he
did not accept. [Id. at 15, ¶ 124.] Beachum claims that it is
not NFI's practice to give terminated employees severance
packages. [Id. at 15, ¶ 126.] NFI calls this a "bare assertion"
and notes that, according to Mansor, that is NFI's practice
(though it is not required). [Docket No. 47-1, ¶¶ 126, 128.]

   Beachum claims that NFI did not follow its disciplinary
policy in making its decision to terminate his employment.

[Docket No. 42-1, at 16, ¶¶ 132-34.] NFI counters that it issued two verbal warnings to Beachum prior to his PIP and had multiple counseling sessions with him, as well. [Docket No. 47-1, ¶¶ 132-33.] Regardless, NFI also points out that NFI does not have a mandatory progressive discipline policy, as Beachum claims. [Id. ¶ 134.]

Beachum also claims that NFI treated him differently from his coworker David Sambath, who also works in IT under the same managers as Beachum, and who also had performance issues during this time period. [Docket No. 42-1, at 17, ¶¶ 144-45.] Sambath also worked from home once a week for childcare purposes. [Id. at 18, ¶ 147.] Beachum admits that Sambath (who is not Black) received verbal and written warnings from NFI, but laments that his employment was never terminated. [Id. at 18, ¶ 146.] NFI agrees that Sambath received reprimands, but points out that his performance then improved sufficiently such that further discipline was not necessary. [Docket No. 47-1, ¶ 144-45.] NFI further notes that Sambath's work-from-home routine was not an issue, in part, because he was not a team leader. [Id. ¶ 147.]

Beachum also raises an incident in which Applegate, a white employee whom Beachum supervised, refused to do certain work, "snap[ped] and yell[ed] at Mr. Beachum," and spoke to him "in an unprofessional and inappropriate manner," which Strong witnessed. [Docket No. 42-1, at 18, ¶¶ 148-49.] Applegate had

27

previously been on a PIP for unspecified reasons. [Id. at 18, ¶ 150.] He has also had other disagreements with coworkers during his employment with NFI. [Id. at 18, ¶ 151.] Strong had previously referred to Applegate as "negative" and a "problem child." [Id. at 18, ¶ 151.] Nevertheless, Beachum laments, Applegate was not disciplined (though Strong testified that he had a conversation with Applegate after the incident with Beachum [Docket No. 47-1, ¶ 149]), and was even promoted sometime thereafter. [Docket No. 42-1, at 18, ¶¶ 149, 153.]

Beachum asserts that Sambath, Applegate, and other unnamed employees were treated more favorably by NFI than he was because they are not Black, they did not make any complaints of discrimination or retaliation, and they never disclosed a medical condition or requested FMLA leave or accommodations. [Id. at 19, ¶¶ 157-58.] NFI disputes the relevance of these examples, noting in particular that unlike Beachum, Sambath and Applegate improved their performances after NFI addressed them; none of them were in leadership positions like Beachum was; and their performances were not as poor as Beachum's.

## II. PROCEDURAL HISTORY

Beachum filed this suit on May 14, 2018. [Docket No. 1.] The Complaint includes six counts. [Id.] Count I alleges violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., in the form of (1) interference and (2)

retaliation. [Id. ¶¶ 40-48.] Count II alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., in the form of (1) actual/perceived record of disability discrimination, (2) hostile work environment, and (3) retaliation. [Id. ¶¶ 49-57.] Count III alleges the same claims as Count II, but under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq., instead of the ADA. [Id. ¶¶ 58-61.] Count IV alleges violations of 42 U.S.C. § 1981 ("Section 1981") in the form of (1) racial discrimination, (2) retaliation, and (3) hostile work environment. [Id. ¶¶ 62-68.] Count V alleges the same claims as Count IV, but under Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq., instead of Section 1981. [Id. ¶¶ 69-72.] Finally, Count VI also alleges the same claims as Counts IV and V, except under the NJLAD instead of Section 1981 and Title VII, respectively. [Id. ¶¶ 73-76.]

NFI answered the complaint on July 16, 2018. [Docket No. 6.] The parties engaged in discovery over the course of the next sixteen months. [See Docket Nos. 7-37.] Then, on November 22, 2019, NFI filed the present Motion for Summary Judgment. [Docket No. 38.] Beachum timely filed his Response in opposition on January 7, 2020. [Docket No. 42.] NFI timely filed its Reply on February 10, 2020. [Docket No. 47.]

### III. JURISDICTION

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

### IV. STANDARD OF REVIEW

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id.

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous. They "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary

judgment. <u>Orsatti v. N.J. State Police</u>, 71 F.3d 480, 484 (3d
Cir. 1995); <u>accord</u> <u>Jackson v. Danberg</u>, 594 F.3d 210, 227 (3d
Cir. 2010) (noting that "speculation and conjecture may not
defeat summary judgment") (citing <u>Acumed LLC v. Advanced</u>
<u>Surgical Servs., Inc.</u>, 561 F.3d 199, 228 (3d Cir. 2009)).

## V.   ANALYSIS

Beachum alleges several claims: FMLA interference; FMLA
retaliation; disability discrimination under the ADA and the
NJLAD; disability hostile work environment under the ADA and the
NJLAD; disability retaliation under the ADA and the NJLAD;
racial discrimination under Section 1981, Title VII, and the
NJLAD; racial retaliation under Section 1981, Title VII, and the
NJLAD; and racial hostile work environment under Section 1981,
Title VII, and the NJLAD. NFI argues that the Court should grant
summary judgment in its favor on all of those claims. In his
opposition to NFI's Motion, Beachum abandons certain claims, but
with respect to the non-abandoned ones he contends that there
are several genuine issues of material fact that preclude the
Court from granting summary judgment in favor of NFI. The Court
will address the remaining claims below.

### A.   Section 1981, Title VII, and NJLAD Racial
### Discrimination and Hostile Work Environment Claims

In his opposition to NFI's Motion, Beachum abandoned his
claims of racial discrimination and hostile work environment

under Section 1981, Title VII, and the NJLAD. [Docket No. 42, at
34-39]. The Court, whose more complete discussion of those
claims would have led to their dismissal anyway, will therefore
grant NFI's Motion with respect to those claims.

**B.   Section 1981, Title VII, and NJLAD Racial Retaliation
      Claims**

Retaliation claims brought under Section 1981, Title VII,
and the NJLAD are analyzed under the burden-shifting framework
established in McDonnell Douglas Corp. v. Green, 411 U.S. 792.
See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir.
2015) (Section 1981 and Title VII); Battaglia v. United Parcel
Serv., Inc., 70 A.3d 602, 619 (N.J. 2013) ("All LAD claims are
evaluated in accordance with the United States Supreme Court's
burden-shifting mechanism."). Under that framework, the burden
is initially on the plaintiff to establish a prima facie case of
retaliation. See id. That requires the plaintiff to show that
(1) he engaged in protected activity (under Section 1981 or
Title VII), (2) he suffered an adverse employment decision, and
(3) a causal connection between the protected activity and the
adverse employment decision exists. See id.; Hutchins v. United
Parcel Servs., Inc., 197 F. App'x 152, 156 (3d Cir. 2006). If
the plaintiff establishes a prima facie case, "the burden shifts
to the employer to present a legitimate, non-retaliatory reason
for having taken the adverse action." Daniels, 776 F.3d at 193.

32

Finally, "[i]f the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)).

The parties do not appear to dispute that the first two prima facie requirements are satisfied here. Beachum verbally indicated that he thought he was being treated differently because of his skin color, which NFI concedes is protected activity. NFI terminated Beachum, which indisputably constitutes an adverse employment action. Therefore, only the causation requirement remains.

The Third Circuit has held that causation can be shown by "the temporal proximity between" the protected activity and the adverse action, if the two are "unusually suggestive." Daniels, 776 F.3d at 196 (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)). Here, NFI fired Beachum within a week of his protected activity. NFI attempts to argue that this does not constitute adequate causation because Beachum's performance at work had been an issue for several months before he made his complaint. [See Docket No. 38-1, at 31.] But this argument does not necessarily rebut the causation element of the prima facie case; rather, it serves more properly as a basis for NFI's argument that it has a legitimate non-

retaliatory reason for firing Beachum. For the purposes of this Motion, the Court will find that the timeline in this case is "unusually suggestive" enough for a reasonable juror to find that the causation requirement has been met. See Daniels, 776 F.3d at 196; see also Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (finding ten days to be "unusually suggestive" enough to establish a causal link). Therefore, considering the evidence in the light most favorable to Beachum, he has presented sufficient evidence for a reasonable juror to find that he established a prima facie case.

The burden therefore shifts to NFI to proffer a legitimate, non-retaliatory reason for terminating Beachum's employment. NFI has met its burden. As discussed at length above, NFI was dissatisfied by Beachum's work performance for some time before his termination, and that was the reason for terminating his employment.

The deciding issue, then, is whether this proffered reason is pretextual. The bulk of Beachum's arguments about pretext are made in support of his other claims, although he incorporated the same arguments in support of this retaliation claim as well. [See Docket No. 42, at 20-23, 39 n.7.] But of those arguments, only the issue of temporal proximity has any real relevance to the racial retaliation claim. As the Third Circuit has held, "temporal proximity may be sufficient to show pretext '[i]n

34

certain narrow circumstances' based on the particular facts and stage of a case." <u>Proudfoot v. Arnold Logistics, LLC</u>, 629 F. App'x 303, 308 (3d Cir. 2015) (quoting <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 302 (3d Cir. 2007)). This Court finds that this case does not fit in those "certain narrow circumstances" described by the Circuit. Aside from Beachum's lone complaint about racial discrimination, made for the first time when he knew he was under investigation, the facts of this case in no way indicate "that retaliation" for his racial discrimination complaint "was the real reason for the adverse employment action." <u>Daniels</u>, 776 F.3d at 193 (quoting <u>Marra</u>, 497 F.3d at 300). Beachum must do more than rely on temporal proximity.

In sum, the Court finds that Beachum has failed as a matter of law to establish that NFI's proffered legitimate, non-retaliatory reason for firing him was pretextual and that the actual reason for firing him was because of his previous assertion that he had been subject to racial discrimination.[7] Therefore, NFI is entitled to summary judgment with respect to that claim.

---

[7] The Court notes that this ruling is limited to Beachum's assertion that his termination was retaliation for voicing his concerns about racial discrimination. This ruling has no bearing on whether NFI's reason was pretextual with respect to Beachum's FMLA- and disability-related claims. As expressed below, there are sufficient (albeit slim) factual disputes with respect to preclude the Court from granting summary judgment on those claims.

C.    Remaining Claims

In opposing NFI's Motion with respect to the remaining claims, Beachum presents what this Court will characterize as barely sufficient evidence that raises questions of credibility as to the allegedly disputed issues. Beachum's evidence, which consists predominantly of his own self-serving, sometimes contradictory testimony, appears to be so outweighed by NFI's evidence that the Court is tempted to grant NFI's Motion for Summary Judgment in full. However, the Court resigns itself to the fact that questions of credibility preclude the Court from taking such action. See Montone v. City of Jersey City, 709 F.3d 181, 191 (3d Cir. 2013) (quoting Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)) ("[I]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . .").

Although the Court does not foresee this happening, it is possible that a jury presented with the parties' clashing narratives in this case could find Beachum and his evidence to be credible and NFI's witnesses and evidence to be not credible. Should that happen, the jury could find that Beachum satisfied his burdens with respect to each of the remaining claims – that is, his claims of FMLA interference, FMLA retaliation, disability discrimination, disability hostile work environment,

36

and disability retaliation — and could therefore deem NFI liable to Beachum on each count. Therefore, the Court cannot grant NFI's Motion with respect to the remaining claims.

Nevertheless, the Court feels compelled to remind the parties that the Court is armed with the ability to impose sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure in the event that claims are pursued in bad faith. The Court also reminds the parties that, should a trial be necessary in this case, the Court may pose an interrogatory to the jury about the credibility of the parties' arguments and whether they were made in good faith. Depending on the jury's response to that interrogatory, the Court would consider imposing fees where appropriate.

**VI.  CONCLUSION**

For the reasons expressed above, the Court will grant NFI's Motion for Summary Judgment, in part, and deny it, in part. Namely, the Court will grant the Motion with respect to Counts IV, V, and VI. It will deny the Motion with respect to Counts I, II, and III. An accompanying Order shall issue.

July 24, 2020                          s/Renée Marie Bumb
Date                                   RENÉE MARIE BUMB
                                       United States District Judge